[Cite as *Portage Cty. Educators Assn. for Dev. Disabilities - Unit B, OEA/NEA v. State Emp. Relations Bd.*, 2020-Ohio-7004.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| PORTAGE COUNTY EDUCATORS ASSOCIATION FOR DEVELOPMENTAL DISABILITIES – UNIT B, OEA/NEA, | : | **O P I N I O N** |
| | : | |
| Appellant, | : | **CASE NO. 2019-P-0055** |
| - vs - | : | |
| STATE EMPLOYMENT RELATIONS BOARD, et al., | : | |
| | : | |
| Appellees. | : | |

Civil Appeal from the Portage County Court of Common Pleas.
Case No. 2018 CV 00408.

Judgment: Reversed; remanded.


*Ira J. Mirkin*, *Richard T. Bush*, and *Stanley J. Okusewsky*, Green, Haines, Sgambati Co., LPA, 100 Federal Plaza East, Suite 800, P.O. Box 849, Youngstown, OH 44501 (For Appellant).

*Ronald J. Habowski*, 1931 Basswood Drive, Kent, OH 44240 (For Appellee Portage County Board of Developmental Disabilities).

*Dave Yost*, Ohio Attorney General, State Office Tower, 30 East Broad Street, 16th Floor, Columbus, OH 43215; and *Lisa A. Reid*, Assistant Attorney General, 615 West Superior Avenue, 11th Floor, Cleveland, OH 44113 (For Appellee State Employment Relations Board).


TIMOTHY P. CANNON, P.J.

{¶1} This appeal stems from a labor relations dispute between the Portage County Educators Association for Developmental Disabilities–Unit B, OEA/NEA ("the

Association") and the Portage County Board of Developmental Disabilities ("the Board"), during which members of the Association picketed outside the private residences of six Board members and outside the place of private employment of one Board member. The State Employment Relations Board determined the Association committed an unfair labor practice. At issue on appeal is whether the statute upon which that determination was based is an unconstitutional restriction on speech. The lower court affirmed its constitutionality. Based on our decision that the statute is content-based, not necessary to serve a compelling state interest, and not narrowly tailored to achieve those interests by the least restrictive means, we reverse the decision of the Portage County Court of Common Pleas and remand the matter for further proceedings.

### Factual and Procedural History

{¶2} The Board and the Association were parties to a collective bargaining agreement effective from September 1, 2013, through August 31, 2016 ("the Agreement"). The Agreement contained a grievance procedure that culminated in final and binding arbitration. On September 28, 2016, the parties began negotiations for a successor agreement. They entered into mediation on March 30, 2017.

{¶3} On September 15, 2017, the State Employment Relations Board ("SERB") received from the Association a Notice of Intent to Strike or Picket. On October 4, 2017, the Board declared an impasse in negotiations pursuant to the parties' Agreement. The Association went on strike that same day. The strike concluded on November 27, 2017, and the parties entered into a successor agreement on November 28, 2017.

{¶4} During the strike, members of the Association engaged in picketing related to the successor contract negotiations, a labor relations dispute, on nine separate days

2

during the month of October 2017. The picketing took place on public sidewalks and/or public streets outside of, in front of, or across the street from the residences of six Board members, as well as the place of private employment of one of those Board members. The Association members who engaged in the picketing did so under the inducement and/or encouragement of the Association. The Association members were aware they were picketing the residences of the six Board members and the place of private employment of one of the Board members.

{¶5} The Board filed seven unfair labor practice charges with SERB against the Association, pursuant to and in accordance with R.C. 4117.12(B) and O.A.C. Rule 4117-7-01. The Board alleged the Association had violated R.C. 4117.11(B)(7) and (B)(8). The (B)(8) allegations were subsequently dismissed for lack of probable cause. With regard to the remaining allegations, the parties agreed to stipulate the case directly to SERB and submitted joint stipulations of fact.

{¶6} The Association challenged the constitutionality of the statute at the hearing level. SERB declined to determine the constitutional validity of the statute in the administrative action due to its lack of jurisdiction over constitutional claims. *State ex rel. Rootstown Local School Dist. Bd. of Educ. v. Portage Cty. Court of Common Pleas*, 78 Ohio St.3d 489, 494 (1997), quoting *State ex rel. Columbus S. Power Co. v. Sheward*, 63 Ohio St.3d 78, 81 (1992) ("'It is settled that an administrative agency is without jurisdiction to determine the constitutional validity of a statute.'").

{¶7} On May 3, 2018, SERB found the Association had violated R.C. 4117.11(B)(7), which provides:

> (B) It is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to: * * * (7) Induce

3

or encourage any individual in connection with a labor relations dispute to picket the residence or any place of private employment of any public official or representative of the public employer[.]

{¶8} The Board is a "public employer" as defined in R.C. 4117.01(B). The Board members are public officials and representatives of the Board. The Association is an "employee organization" as defined in R.C. 4117.01(D) and is the exclusive representative for all Service and Support Administrators as defined in R.C. 5126.15 and O.A.C. 5123-4-02 (previously defined in O.A.C. 5123:2-1-11).

{¶9} The Association filed an administrative appeal in the Portage County Court of Common Pleas, challenging the constitutionality of the statute on its face and as applied. It argued R.C. 4117.11(B)(7) is an unconstitutional content-based restriction on speech, in violation of the First Amendment to the United States Constitution.

{¶10} The lower court upheld SERB's decision in a March 27, 2019 judgment entry. The lower court held that R.C. 4117.11(B)(7) is content-neutral, constitutional, and enforceable.

**Assignment of Error**

{¶11} From this judgment, the Association appealed to this court and raises one assignment of error for our review:

> The lower court erred in affirming the State Employment Relations Board's unfair labor practice determination against Appellant Association because such determination and the statute upon which it was based, R.C. 4117.11(B)(7), ban constitutionally protected picketing activity in violation of the rights of the Association and its members to free speech and equal protection.

{¶12} We review challenges to the constitutionality of a law de novo. *State v. Weaver*, 11th Dist. Trumbull No. 2013-T-0066, 2014-Ohio-1371, ¶10; *Am. Fedn. of State, Cty. & Mun. Emps. Local # 74 v. Warren*, 177 Ohio App.3d 530, 2008-Ohio-3905,

4

¶30 (11th Dist.). "De novo review is independent from and without deference to the trial court's determination." *State v. Henderson*, 11th Dist. Portage No. 2010-P-0046, 2012-Ohio-1268, ¶10 (citation omitted).

{¶13} R.C. 4117.11(B)(7) is part of the state of Ohio's Public Employees Collective Bargaining Act, which was enacted in 1984 to govern labor relation disputes between the government as an employer and its public employees. It was "intended to create a comprehensive scheme to facilitate the orderly resolution of or to minimize labor relation disputes involving public employees by creating clarity and stability in an area that previously had none." *Harrison Hills Teachers Assn. v. State Emp. Relations Bd.*, 7th Dist. Harrison No. 15 HA 0008, 2016-Ohio-4661, ¶32, citing *State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.*, 22 Ohio St.3d 1, 5 (1986).

{¶14} The statute prohibits an "employee organization," such as the Association, from "induc[ing] or encourag[ing] any individual in connection with a labor relations dispute," such as the Association members, "to picket the residence or any place of private employment" of any "representative of the public employer," such as the Board members. At issue is whether R.C. 4117.11(B)(7) is an unconstitutional content-based regulation of speech.

**Restrictions on Speech in Public Forums**

{¶15} "It is well settled that picketing is a 'pristine and classic' exercise of First Amendment freedoms, striking at the core of our nation's commitment to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Seven Hills v. Aryan Nations*, 76 Ohio St.3d 304, 306 (1996), quoting *Edwards v. South*

5

*Carolina*, 372 U.S. 229, 235 (1963) and *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). "While citizens do not enjoy the absolute right to free speech, neither does the state enjoy the absolute right to regulate speech. Rather, the degree to which a state may regulate speech depends upon the place of that speech." *Id.*, citing *Frisby v. Schultz*, 487 U.S. 474, 479 (1988), citing *Perry Edn. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983).

{¶16} The parties agree that the picketing at issue took place on public streets and public sidewalks in front of or across from the Board members' residences and place of private employment. These are "quintessential" public forums. Thus, our First Amendment analysis begins with a determination as to whether R.C. 4117.11(B)(7) is "content-based" or "content-neutral." *Id.*, citing *Frisby* at 481 and *Perry* at 45, *supra* ("The constitutionality of restrictions on speech in a public forum is measured by whether the particular restriction is content-based or content-neutral.").

Content-Neutral Restrictions

{¶17} "Content-neutral speech restrictions are those that are '"justified without reference to the content of the regulated speech."'" *Id.*, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). "A regulation is said to be content-neutral if it merely incidentally burdens speech by regulating the time, place, or manner of the speech. * * * 'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Harrison Hills*, *supra*, at ¶21, quoting *Ward*, *supra*, at 791 and citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000).

6

{¶18} Content-neutral restrictions are subject to "intermediate scrutiny" review. "In meeting the intermediate scrutiny test for a content-neutral law, the statute must impose a reasonable restriction that is narrowly tailored to serve a significant (as opposed to compelling) governmental interest and must leave open alternative channels for communication of the information." *Id.* at ¶18, citing *Perry*, *supra*, at 45 and *Ward*, *supra*, *at* 791, 797-798 (the law need not be the least restrictive means).

<u>Content-Based Restrictions</u>

{¶19} "On the other hand, restrictions that focus on the direct impact of the speech on its audience are properly analyzed as content-based." *Seven Hills*, *supra*, at 306, citing *Boos v. Barry*, 485 U.S. 312, 321 (1988).

> Government regulation of speech is content based if a law applies to particular speech because of the *topic discussed or the idea or message expressed*. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-164 (2015) (citations omitted) (emphasis added); *accord Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.*, 512 U.S. 622, 642-643 (1994) and *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (a law may be content based regardless of whether the law favors or disfavors the message being regulated).

{¶20} Content-based restrictions are subject to "strict scrutiny" review, as they necessarily implicate Equal Protection principles. "In meeting the strict scrutiny test for a content-based law, the government is required to show that the regulation is

7

necessary to serve a compelling state interest and is narrowly tailored to achieve that interest by the least restrictive means." *Harrison Hills*, *supra*, at ¶17, citing *Perry*, *supra*, at 45 and *Playboy*, *supra*, at 813; *accord Carey v. Brown*, 447 U.S. 455, 461-462 (1980) (citations omitted) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.").

<u>Burden of Proof</u>

{¶21} Content-neutral restrictions are presumed valid; the party challenging the statute must show it is unconstitutional. *See Ward*, *supra*, at 789-790; *State v. Thompkins*, 75 Ohio St.3d 558, 560 (1996). Content-based restrictions are presumed invalid; the burden is on the government to show that the restriction is constitutional. *Playboy*, *supra*, at 816-817; *accord In re Judicial Campaign Complaint*, 141 Ohio St.3d 355, 2014-Ohio-4046, ¶19-20.

**Revised Code § 4117.11(B)(7)**

{¶22} First, we must emphasize the particular prohibition of the statute. R.C. 4117.11(B)(7) does not directly prohibit picketing. Rather, it prohibits the inducement or encouragement of picketing:

> (B) It is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to: * * * (7) *Induce or encourage* any individual in connection with a labor relations dispute *to picket* the residence or any place of private employment of any public official or representative of the public employer[.]

(Emphasis added.) This distinction was not noted by the parties on appeal, nor is it evident from certain case law and secondary sources, which often refer to the statute as

8

a prohibition on picketing. Nevertheless, in terms of a free speech analysis, it is a distinction without a difference. The statute must be analyzed in terms of picketing, in order to determine whether the proscription against inducing or encouraging picketing is in furtherance of a lawful or unlawful objective. *See, e.g., Internatl. Bhd. of Elec. Workers v. Natl. Labor Relations Bd.*, 341 U.S. 694 (1951) ("*IBEW v. NLRB*") (analyzing the federal government's power to prohibit the inducement or encouragement of secondary picketing under the National Labor Relations Act).

{¶23} Two Ohio appellate districts have analyzed the constitutionality of R.C. 4117.11(B)(7) as it pertains to the regulation of speech:

{¶24} In 1998, the Eighth Appellate District reviewed a challenge to the statute after union members picketed the residence of a public official. The court held the statute is an unconstitutional restriction on speech because it "is not content-neutral, does not serve a compelling state interest, and is not narrowly tailored." *United Elec., Radio & Machine Workers of Am. v. State Emp. Relations Bd.*, 126 Ohio App.3d 345, 354 (8th Dist.1998), *appeal not allowed*, 83 Ohio St.3d 1447 (1998).

{¶25} In 2016, the Seventh Appellate District reviewed a challenge to the statute after union members picketed a public street outside a school board member's place of private employment. In that context, the court held the statute is a constitutional restriction on speech because it is "'justified without regard to the content' of the regulated conduct and is a reasonable time, place, or manner restriction, most specifically a place restriction." *Harrison Hills Teachers Assn. v. State Emp. Relations Bd.*, 7th Dist. Harrison No. 15 HA 0008, 2016-Ohio-4661, ¶36, quoting *Ward, supra*, at 791.

9

## Chicago v. Mosley and Carey v. Brown

{¶26} In *United Electrical*, the Eighth District reached its decision that R.C. 4117.11(B)(7) is unconstitutional by relying on two United States Supreme Court cases: *Chicago v. Mosley*, 408 U.S. 92 (1972) and *Carey v. Brown*, 447 U.S. 455 (1980).

{¶27} In *Chicago v. Mosley*, picketing near a school was prohibited except for peaceful labor picketing of a school involved in a labor dispute. The Chicago ordinance provided:

> 'A person commits disorderly conduct when he knowingly:
>
> '(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided, that *this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute*. . . .' Municipal Code, c. 193—1(i).

*Mosley, supra*, at 92-93.

{¶28} The United States Supreme Court determined this ordinance was content based because it "describes impermissible picketing not in terms of time, place, and manner, but in terms of subject matter." *Id.* at 99. "Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign." *Id.* at 95. The Court explained that, "[o]nce a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Id.* at 96. The Court further concluded the content-based ordinance was not narrowly tailored to achieve a compelling governmental interest because "'[p]eaceful' nonlabor picketing,

however the term 'peaceful' is defined, is obviously no more disruptive than 'peaceful' labor picketing." *Id.* at 100.

{¶29} The Court was careful to provide, however, that its holding in *Mosley* "is not to say that all picketing must always be allowed. We have continually recognized that reasonable 'time, place and manner' regulations of picketing may be necessary to further significant governmental interests." *Id.* at 98, citing *Cox v. New Hampshire*, 312 U.S. 569, 575-576 (1941); *Poulos v. New Hampshire*, 345 U.S. 395, 398 (1953); *Cox v. Louisiana*, 379 U.S. 536, 554-555 (1965); and *Adderley v. Florida*, 385 U.S. 39, 46-48 (1966). "And the State may have a legitimate interest in prohibiting some picketing to protect public order. But these justifications for selective exclusions from a public forum must be carefully scrutinized." *Id.* at 98-99.

{¶30} In *Carey v. Brown*, an Illinois statute prohibited picketing of residences or dwellings unless the residence or dwelling was used as a place of business. The statute provided:

> 'It is unlawful to picket before or about the residence or dwelling of any person, except when the residence or dwelling is used as a place of business. However, this Article does not apply to a person peacefully picketing his own residence or dwelling and does not prohibit the peaceful picketing of a place of employment involved in a labor dispute or the place of holding a meeting or assembly on premises commonly used to discuss subjects of general public interest.'

*Carey*, *supra*, at 457.

{¶31} The U.S. Supreme Court interpreted the "place of employment" exception as dividing "residences and dwellings" into two categories: (1) "those at which picketing is lawful (*i.e.*, all places of employment involved in labor disputes)" and (2) "those at which it is unlawful (*i.e.*, all other residences and dwellings)." *Id.* at 461, fn. 5. Further,

11

the parties and courts involved in the litigation "interpreted the statutory exception for 'peaceful picketing of a place of employment involved in a labor dispute' as embodying the additional requirement that the subject of the picketing be related to the ongoing labor dispute." *Id.* at 460, fn. 4.

{¶32} The Court determined the statute at issue was content based. "On its face, the statute accords preferential treatment to the expression of views on one particular subject; information about labor disputes may be freely disseminated but discussion of all other issues is restricted. The permissibility of residential picketing under the Illinois statute is thus dependent solely on the nature of the message being conveyed." *Id.* at syllabus.

{¶33} The Court held that the statute in *Carey* was also unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. "While the State's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order, the crucial question is whether the statute advances that objective in a manner consistent with the Equal Protection Clause. Because the statute discriminates among pickets based on the subject matter of their expression, the answer to that question must be 'No.'" *Id.*

{¶34} Again, the *Carey* Court warned it was "not to be understood to imply, however, that residential picketing is beyond the reach of uniform and nondiscriminatory regulation. For the right to communicate is not limitless. Even peaceful picketing may be prohibited when it interferes with the operation of vital governmental facilities or when it is directed toward an illegal purpose." *Id.* at 470 (internal citations omitted). "Moreover, we have often declared that '[a] state or municipality may protect individual

12

privacy by enacting reasonable time, place, and manner regulations applicable to all speech *irrespective of content.*'" *Id.* (emphasis sic), quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975). "In sum," the Court concluded, "'no mandate in our Constitution leaves States and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people either for homes, wherein they can escape the hurly-burly of the outside business and political world, or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals.'" *Id.* at 470-471, quoting *Gregory v. Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring).

**R.C. 4117.11(B)(7) is Content Based**

{¶35} Relying on *Mosley* and *Carey*, the Eighth District declared in *United Electrical* that R.C. 4117.11(B)(7) is unconstitutional because the Ohio statute regulates picketing in a public forum solely on the basis of its content. The court held, "[i]n the case at bar, the state of Ohio's purpose is to regulate a very specific type of speech: residential labor picketing. The statute does not neutrally regulate all residential picketing; rather, the statute's proscription against residential picketing applies only to 'a labor relations dispute.'" *United Elec.*, *supra*, at 351-352.

{¶36} Here, the Association urges this court to reverse the lower court's decision based on the line of reasoning found in *Mosley, Carey*, and *United Electrical*. The Association argues that, in addition to the "place" regulation found in R.C. 4117.11(B)(7), the phrase, "in connection with a labor dispute," also regulates content.

13

{¶37} The Board and SERB respond that R.C. 4117.11(B)(7) is distinguishable from the laws at issue in *Mosley* and *Carey* because the statute is merely a reasonable "time, place and manner" regulation irrespective of content.

{¶38} In *Mosley*, the ordinance prohibited all picketing near a school except for peaceful picketing of a school involved in a labor dispute. In *Carey*, the statute prohibited residential picketing except for peaceful picketing of a place of employment involved in a labor dispute. Whether an individual violated these laws by picketing in a particular place depended on the content of the message on the individual's picket sign: if related to a labor dispute, it was lawful; any other message was unlawful.

{¶39} R.C. 4117.11(B)(7) provides that an employee organization (e.g., the Association) commits an unfair labor practice when it induces or encourages any individual in connection with a labor relations dispute (e.g., the Association members) to picket in two locations—the residence or place of private employment of a public employer's representatives (e.g., the Board members). It is without question, therefore, that the statute does regulate the "place" of where picketing may be induced or encouraged. However, it is only a violation of the statute to induce or encourage picketing at those locations when said picketing is "in connection with a labor relations dispute." Whereas the laws in *Mosley* and *Carey* favored labor picketing, R.C. 4117.11(B)(7) disfavors it. In other words, if related to a labor relations dispute, inducing or encouraging the picketing is unlawful under the statute; if not related to a labor relations dispute, inducing or encouraging the picketing is lawful under the statute. Thus, similar to *Mosley* and *Carey*, whether an individual or organization violates the statute depends on the content of the message on the picket sign.

**{¶40}** Accordingly, we agree with the Eighth District's holding in *United Electrical*. We disagree, therefore, with the Seventh District's subsequent holding in *Harrison Hills*, that the statute is "'justified without regard to the content' of the regulated conduct and is a reasonable time, place, or manner restriction, most specifically a place restriction." *Harrison Hills*, *supra*, at ¶36, quoting *Ward*, *supra*, at 791. The limitation is not merely upon the place at which the Association may induce or encourage its members to picket, it is also based upon content.

### Secondary Picketing

**{¶41}** In *Harrison Hills*, the Seventh District further distinguished picketing a place of private employment from picketing a private residence by concluding that the former "is more akin to the secondary picketing labor cases than the *Mosley* and *Carey* cases[.]" *Id.* at ¶34. As explained below, we disagree with the Seventh District's analysis of secondary picketing and, therefore, with its conclusion that strict scrutiny does not apply to the whole of R.C. 4117.11(B)(7).

**{¶42}** "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employee's demands." *Internatl. Bhd. of Elec. Workers, Local 501 v. Natl. Labor Relations Bd.*, 181 F.2d 34, 37 (2d Cir.1950), *aff'd*, 341 U.S. 694 (1951).

**{¶43}** "The typical paradigm in the industrial context features a labor organization with a dispute against A, but instead of merely pressuring A directly with a strike, picket, handbill or other action, the labor organization pressures A indirectly, by

15

making A's clients, suppliers or other persons with whom A conducts business the target of such activity. The desired effect is to pressure A to capitulate to union demands by virtue of the threat of those other persons terminating their relationships with A in order to be rid of the unwanted union pressure." Bock, *Secondary Boycotts: Understanding NLRB Interpretation of Section 8(b)(4)(B) of the Natl. Labor Relations Act*, 7 U. Pa. J. Lab. & Emp. L. 905, 908 (2005) (footnotes omitted).

<u>Lawful vs. Unlawful Secondary Picketing</u>

{¶44} In *Harrison Hills*, the Seventh District essentially reached a conclusion that *all* secondary picketing in the context of a labor dispute may be proscribed by the state because it is contrary to state policy and was enjoined under the common law. *Harrison Hills, supra*, at ¶35. However, this conclusion fails to consider the nuances of the opinions on this issue from both the Ohio and United States Supreme Courts. Neither the prohibitions on secondary picketing that have been upheld nor the relevant case law proscribe all secondary activity. Rather, there are distinctions between lawful and unlawful secondary activity based on the picketer's conduct and objective.

{¶45} For instance, the Seventh District relied on the Ohio Supreme Court case of *W.E. Anderson Sons* for its statement that Ohio common law enjoined the secondary picketing of neutrals. However, the definition of a prohibited "secondary boycott" in *W.E. Anderson Sons* did not encompass all secondary activity. Rather, it was limited as follows:

> 'A secondary boycott is a combination not merely to refrain from dealing with a person, or to advise, or by peaceful means persuade, his customers to refrain from dealing with him, but *to exercise coercive persuasion* upon such customers, actually causing them to withhold or withdraw their patronage from his through fear of loss or damage to themselves.'

16

*W.E. Anderson Sons Co. v. Local Union No. 311, Internatl. Bhd. of Teamsters*, 156 Ohio St. 541, 563 (1952) (emphasis added), quoting 24 Ohio Jurisprudence, 676, Section 61.

{¶46} Indeed, the syllabus of the Court provides that, "Where no unlawful purpose or object is involved, workers may by means of picketing or bannering announce their grievances to the public and thus persuade or seek to persuade prospective employees as well as prospective customers of the person against whom the picketing or bannering is directed from dealing with such person." *Id.* at paragraph one of the syllabus. "Picketing or bannering as a means of exercising the right of free speech will be afforded constitutional protection so long as it is lawfully conducted, but the right of free speech is predicated on the lawful exercise of such right, and if, through conspiracy or unlawful conduct, the result of its exercise by such means unlawfully injures another in his property rights, the guaranty ceases and the exercise of the claimed right by such means may be enjoined or prohibited." *Id.* at paragraph four of the syllabus.

{¶47} The Seventh District also relied heavily on *Carpenters & Joiners Union of Am., Local No. 213 v. Ritter's Café*, 315 U.S. 722 (1942). In *Ritter's Café*, a Texas state court enjoined a union that picketed outside a restaurant. The owner of the restaurant had permitted the hiring of non-union workers to construct an unrelated building at another location. The United States Supreme Court upheld the state court's decision. Again, while this case recognized the states' right to regulate some forms of secondary activity, the specific prohibition that was upheld was characterized by the Supreme Court as "*the exertion of concerted pressure directed at the business*, wholly outside the

17

economic context of the real dispute, of a person whose relation to the dispute arises from his business dealings with one of the disputants." *Id.* at 726 (emphasis added).

**{¶48}** Also contrary to the Seventh District's broad statements regarding secondary activity, the *Ritter's Café* Court expounded that "[t]he constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved, or because the communication takes the form of picketing, even when the communication does not concern a dispute between an employer and those directly employed by him." *Id.* at 725, citing *Thornhill v. Alabama*, 310 U.S. 88 (1940) and *Am. Fedn. of Labor v. Swing*, 312 U.S. 321 (1941).

**{¶49}** We must further note that the *Ritter's Café* opinion is of limited precedential value, as it was decided prior to the enactment of the National Labor Relations Act ("NLRA") and the United States Supreme Court's delineation of prohibited and permitted secondary activity. The current version of this federal statute, which prohibits certain secondary activity, was established in 1959 pursuant to the Landrum-Griffin amendments to the NLRA. *See Natl. Labor Relations Bd. v. Retail Store Emps. Union, Local 1001*, 447 U.S. 607, 615, fn. 10 (1980) ("*Retail Store*"). Specifically, Section 8(b)(4)(ii)(B) of the NLRA (codified at 29 U.S.C. 158(b)(4)(ii)(B)) makes it an "unfair labor practice for a labor organization or its agents * * * to threaten, coerce, or restrain" a person not party to a labor dispute "where * * * an object thereof is * * * forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

{¶50}  In *Retail Store*, the United States Supreme Court recognized that section 8(b)(4)(ii)(B) of the NLRA "does not prohibit *all* peaceful picketing at secondary sites." *Id.* at 611 (emphasis added), citing *Natl. Labor Relations Bd. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58 (1964) ("*Tree Fruits*").  Rather, "the statute directed to an 'isolated evil,'" which is the "use of secondary picketing 'to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer.'"  *Id.* at 612, quoting *Tree Fruits, supra*, at 63.

{¶51}  After *Retail Store*, the United States Supreme Court announced: "We have consistently rejected the claim that secondary picketing by labor unions *in violation of § 8(b)(4)* is protected activity under the First Amendment.  It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment."  *Internatl. Longshoremen's Assn., AFL–CIO v. Allied Internatl., Inc.*, 456 U.S. 212, 226 (1982) (emphasis added), citing *Retail Store* at 616 and *Tree Fruits* at 63, *supra*, and *Am. Radio Assn., AFL-CIO v. Mobile S.S. Assn., Inc.*, 419 U.S. 215, 229-231 (1974).

{¶52}  Section 8(b)(4)(ii)(B) of the NLRA is expressly limited to "threats," "coercion," or "restraint."  The case law cited above is similarly limited to unlawful behavior or unlawful objectives.  The Supreme Court of the United States has further "recognized the constitutional right of states to proscribe picketing in furtherance of *comparably unlawful objectives*" as described in that section.  *IBEW v. NLRB, supra*, at 705 (emphasis added).  The Court has cautioned, however, that even this language is "'nonspecific, indeed vague,' and should be interpreted with 'caution' and not given a

'broad sweep.' *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988), quoting *Natl. Labor Relations Bd. v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 290 (1960).

{¶53} R.C. 4117.11(B)(7) does not contain any such limiting language. Again, R.C. 4117.11(B)(7)'s restriction on picketing broadly states that "[i]t is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to: * * * [i]nduce or encourage any individual in connection with a labor relations dispute to picket the residence or any place of private employment of any public official or representative of the public employer[.]"

{¶54} Nevertheless, in *Harrison Hills*, the Seventh District attempted to liken the NLRA prohibition with that found in R.C. 4117.11(B)(7): "This picketing of the private employer [under (B)(7)] seeks to draw a neutral into the collective bargaining strife against his will and influence or coerce that neutral into pressuring its employee in order to avoid the negative effects of a picket line." *Harrison Hills*, *supra*, at ¶34.

{¶55} Because R.C. 4117.11(B)(7) does *not* merely prohibit the act of influencing or coercing a neutral against his or her will, we reject this comparison and are unable to rely on these cases to conclude that the entirety of (B)(7) should not be subjected to strict scrutiny.

<u>The Association Did Not Induce or Encourage Secondary Picketing</u>

{¶56} There is also a critical factual distinction not addressed in *Harrison Hills*, namely that the picketing was **of** a Board member conducted **at** the Board member's place of employment, not **of** the Board member's private employer. Unlike the prohibited secondary picketing or boycott activities discussed above, the picketing here

20

was not directed to a third-party employer in connection with the business of the Board, with the underlying labor dispute, or with that employer's business or products. The third-party employer and its business were not targeted in any way. The Board member simply worked there, the Association members held signs that read "Board Unfair to Workers," and the picketing was done on the public street or sidewalk.

{¶57} We conclude the activity that occurred here was not secondary picketing, at all; nor was it "akin to" secondary picketing, as found by the Seventh District. Further, because the restriction in (B)(7) is content based and encompasses the encouragement or incitement of *lawful* secondary picketing, the entire restriction is presumed invalid and subject to strict scrutiny.

**Strict Scrutiny Review**

{¶58} To overcome the presumption of unconstitutionality, the government must demonstrate that the regulation is (1) necessary to serve a compelling state interest and (2) narrowly tailored to achieve that interest by the least restrictive means. *Perry* at 45 and *United Elec.* at 352, *supra*.

Compelling State Interest

{¶59} SERB and the Board contend the governmental interests the statute seeks to serve are (1) maintaining the residential privacy rights of public employer representatives; (2) encouraging private citizens to serve as public officials; and (3) preserving labor peace. The state is primarily concerned that, although government employees have been granted the right to unionize and strike, public service will be deterred if the state is not careful to protect the private lives of its public servants.

21

{¶60} We recognize, as higher courts have before us, that protecting individual privacy is indeed a "significant" governmental interest. The United States Supreme Court has "often declared that '[a] state or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations[.]'" *Carey*, *supra*, at 470, quoting *Erznoznik*, *supra*, at 209. The governmental interest in protecting the ""well-being, tranquility, and privacy of the home"" has also been recognized as "significant" by the Supreme Court of Ohio. *Seven Hills*, *supra*, at 309, quoting *Frisby*, *supra*, at 484, quoting *Carey*, *supra*, at 471.

{¶61} Nevertheless, the Supreme Court of Ohio has determined that protecting residential privacy is not a "compelling" governmental interest, recognizing that the United States Supreme Court has "expressly preserved the right of protesters to march through a residential neighborhood or go door-to-door within the residential neighborhood regardless of the residents' rights to privacy and well-being." *Id.*, citing *Frisby*, *supra*, at 483-484; *accord Kirkeby v. Furness*, 92 F.3d 655, 659 (9th Cir.1996) (noting the U.S. Supreme Court has never held this to be a compelling interest).

{¶62} We also agree with the Eighth Appellate District, that "the state's broad declarations about the government's interest in preserving labor peace are too vague to qualify as compelling interests." *United Elec.*, *supra*, at 353 (citation omitted). "The law does not require peace at any price. Nor is peace to be defined as the absence of dispute." *Id.*

{¶63} In fact, the Supreme Court of the United States recognized long ago that "a function of free speech under our system of government is to invite dispute." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). According to the Court:

22

It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

*Id.* (internal citations omitted).

{¶64} Further, the Court has held that "[p]redictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter." *Mosley*, *supra*, at 100-101. "'In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.' Some labor picketing is peaceful, some disorderly; the same is true of picketing on other themes." *Id.* at 101, quoting *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 508 (1969).

{¶65} The people of Ohio, through the state constitution, have expressed their desire to assure the equal protection and benefit of the law, to protect free speech, and to allow for legislation concerning employees' welfare and rights. The Ohio Constitution is much more detailed in its protection of freedom of speech than the First Amendment to the United States Constitution, stating as follows: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *" Ohio Constitution, Article I, Section 11. Additionally, the Ohio Constitution addresses the welfare and rights of employees, providing that "[l]aws

23

may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of the constitution shall impair or limit this power." Ohio Constitution, Article II, Section 34.

{¶66} In light of the above constitutional protections, we conclude that SERB has failed to meet its burden to establish that R.C. 4117.11(B)(7) is necessary to serve a compelling state interest.

Narrowly Tailored

{¶67} Even if SERB had established such an interest, R.C. 4117.11(B)(7) is not narrowly tailored to achieve that interest by the least restrictive means.

{¶68} First, "[t]he state's interest in labor peace is similarly covered by other sections of Ohio's collective bargaining law, which is to be liberally construed to promote orderly and constructive relationships between public employees and their employers." *United Elec.*, *supra*, at 354, citing R.C. 4117.22. And "[w]e already have residential ordinances and a criminal code to preserve law and order and residential privacy. Moreover, these regulations, which focus on a specific abuse, deal evenhandedly with picketing in general, regardless of subject matter." *Id.* at 353, citing *Carey*, *supra*, at 462.

{¶69} Second, in contrast to the prohibited secondary picketing discussed above, R.C. 4117.11(B)(7) contains no specificity regarding the picketer's conduct (e.g., threats, coercion, or restraint) or the picketer's objective (e.g., to force or require cessation of business activity), nor does it draw any distinction regarding the picketer's target (e.g., the private employer's business or products).

{¶70} As a result, (B)(7) prohibits the activity involved in this case, which did not involve threats, coercion, or restraint, was not intended to force or require cessation of the private employer's business activity, and was directed at the individual Board member rather than at the private employer, its business, or even its products. In essence, (B)(7) also prohibits lawful secondary picketing and, as here, conduct that cannot even be fairly classified as secondary picketing.

{¶71} Further, there were readily available and significantly less restrictive alternatives to reach only activity that the Supreme Court of the United States has previously found to constitute prohibited secondary picketing. For example, in *Boos v. Barry*, the Court found that a statute prohibiting the display of signs critical of a foreign government within 500 feet of an embassy was not narrowly tailored in light of an analogous statute that prohibited only intimidation, coercion, threats, harassment, and obstruction. *Boos, supra*, at 313, 324-325. Here, the General Assembly could have implemented restrictions similar to those set forth in the NLRA and as interpreted by the Court.

{¶72} As Justice Black noted in his concurrence in the *Tree Fruits* case, legislation restricting the union's ability to disseminate information about a labor dispute via secondary, non-coercive picketing in a public forum on a public street or sidewalk results in "neither a case in which picketing is banned because the picketers are asking others to do something unlawful nor a case in which all picketing is, for reasons of public order, banned. Instead, we have a case in which picketing, otherwise lawful, is banned only when the picketers express particular views. The result is an abridgment of the freedom of these picketers to tell a part of the public their side of a labor

25

controversy, a subject the free discussion of which is protected by the First Amendment." *Tree Fruits*, *supra*, at 79 (Black, J., concurring).

**Conclusion**

{¶73} Given the rights secured by the federal and state Constitutions, and without the underpinning of a compelling state interest and a narrowly tailored statute, R.C. 4117.11(B)(7)'s restrictions on inducing and encouraging picketing cannot withstand strict scrutiny.

{¶74} The Association's sole assignment of error is well taken. It was error for the lower court to uphold SERB's decision that the Association committed an unfair labor practice when it induced or encouraged the Association members to picket the residences and place of private employment of the Board members.

{¶75} The judgment of the Portage County Court of Common Pleas is reversed. This matter is remanded to the trial court for further proceedings consistent with this opinion.


THOMAS R. WRIGHT, J., concurs,

MARY JANE TRAPP, J., concurs with a Concurring Opinion.

_____


MARY JANE TRAPP, J., concurs with a Concurring Opinion.

{¶76} I concur with the analysis and judgment of the court in determining that R.C. 4117.11(B)(7)'s picketing restrictions do not serve a compelling state interest and

are not narrowly tailored to survive a constitutional challenge. I write separately to expand upon the discussion of the important constitutional issues this case presents.

**Identity of the Speaker**

{¶77} It is critical to add to this court's analysis that a more recent line of First Amendment cases supports a finding that R.C. 4117.11(B)(7), in addition to being a content-based restriction, constitutes a constitutionally infirm restriction based on the identity of the speaker.

{¶78} In *Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 7th Dist. Mahoning No. 11 MA 52, 2012-Ohio-3000 ("*MEADD I*"), the Seventh District found that the singling out of public employee organizations and public employees in R.C. 4117.11(B)(8) constitutes a restriction based on the identity of the speaker and applied strict scrutiny. *See id.* at ¶21.

{¶79} It supported this determination by citing the Supreme Court of the United States' more recent First Amendment jurisprudence in other contexts. *See*, *e.g.*, S*orrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011), quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992) (holding that law targeting certain speakers and their messages for disfavored treatment was "'actual viewpoint discrimination'"); *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.*, 512 U.S. 622, 658 (1994) (reaffirming its holding in *Buckley v. Valeo*, 424 U.S. 1 (1976), that "speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)"); *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-430 (1993) (holding that a law's burden on commercial handbills that does not burden an ordinary newspaper is a

27

type of content-based law subject to strict scrutiny); and most notably, *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 340 (2010) (holding that "restrictions distinguishing among different speakers, allowing speech by some but not others" are prohibited).

{¶80} As Justice Kennedy observed in writing for the court in *Citizens United*:

{¶81} "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.

{¶82} "Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." (Citations omitted.) *Id.* at 340-341.

{¶83} *MEADD I* involved the constitutionality of R.C. 4117.11(B)(8), which imposes notice requirements when an employee organization (including its agents or representatives) or public employees "[e]ngage in any picketing, striking, or other concerted refusal to work * * *." However, the language regarding the identity of the speaker is set forth in subsection (B), which applies equally to both (B)(7) and (B)(8).

28

{¶84} The Supreme Court of Ohio affirmed the Seventh District's judgment in *MEADD I* on non-constitutional grounds, finding that R.C. 4117.11(B)(8) did not apply to "picketing that is merely information in nature" as opposed to "picketing related to a work stoppage, strike, or refusal to work" due to the modifying language "or other concerted refusal to work." *Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 137 Ohio St.3d 257, 2013-Ohio-4654, ¶4, 15 ("*MEADD II*"). However, the picketing restriction in R.C. 4117.11(B)(7) does not contain this language, so it is not susceptible to the same limiting construction. *See Harrison Hills Teachers Assn. v. State Emp. Relations Bd.*, 7th Dist. Harrison No. 15 HA 0008, 2016-Ohio-4661, ¶11, fn. 3 (noting that the restriction in R.C. 4117.11(B)(7) encompasses informational picketing).

{¶85} As the Seventh District noted in *MEADD I,* the statute "singles out a certain type of speaker: a public employee organization and the public employees themselves. That is, anyone can picket * * * except public employees and their union * * *. Thus, * * * it creates a disfavored speaker by discriminating against public employees and their unions * * *." *Id.* at ¶21.

{¶86} Accordingly, I would find that R.C. 4117.11(B)(7) also constitutes an unconstitutional restriction based on the identity of the speaker.

**Governmental Interests**

{¶87} I also wish to elaborate on the discussion of the governmental interests that R.C. 4117.11(B)(7) purportedly serves.

{¶88} As this court's opinion notes, SERB and the Board posit that R.C. 4117.11(B)(7) serves three state interests: (1) maintaining the residential privacy rights

29

of the public employer representative; (2) encouraging public service; and (3) preserving labor peace. SERB and the Board must demonstrate, as opposed to merely assert, the compelling nature of these interests. *United Elec., Radio & Machine Workers of Am. v. State Emp. Relations Bd.*, 126 Ohio App.3d 345, 352 (8th Dist.1998) ("*United Elec.*").

{¶89} It should be further noted that the first interest expressly relates to R.C. 4117.11(B)(7)'s restriction on residential picketing, so only the second and third interest could potentially apply to its restriction on picketing a place of private employment.

{¶90} With respect to the second asserted interest of encouraging public service, SERB has cited no legal authority recognizing such an interest as compelling. In fact, the Eighth District determined in *United Elec.* that such an interest did not qualify as compelling. *See id.* at 353 ("There is no evidence that encouraging citizens to serve as officials of public employers is a 'compelling' state interest, although it may be a desirable goal").

{¶91} I would find this interest to be, at most, significant but not compelling, nor is the statute's restriction narrowly tailored, inasmuch as the interest is already addressed by existing public peace and safety statutes and ordinances.

{¶92} With respect to the third interest of preserving labor peace, I disagree with SERB's position that a prohibition of secondary picketing by labor unions, generally, and at a board member's place of private employment, specifically, serves a compelling state interest in preserving the ability of "neutral employers, employees and consumers to remain free from coerced participation in industrial strife."

{¶93} In support of this proposition, SERB quotes the Supreme Court of the United States' decision *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

30

The court's 1982 decision in *Claiborne* distinguished commercial speech and political speech. *See id.* at 913. According to the court, picketing may be regulated or even prohibited because states have broad power to regulate economic activity, but there is not a "comparable right to prohibit peaceful political activity." *Id.*

{¶94} The court's more modern First Amendment cases, particularly *Citizens United* and *Sorrell*, have moved far beyond *Claiborne*'s distinctions. *See United Elec.* at 352, fn. 2 (noting that many labor picketing cases "were decided prior to modern Supreme Court jurisprudence which applies the content-based/content-neutral analysis").

{¶95} For instance, the court's analysis regarding the identity of the speaker articulated in *Citizens United* led to a declaration that corporate independent campaign expenditures are a form of protected political speech meriting the highest form of scrutiny. *See id.* at 365. The court forcefully declared that the government may not suppress political speech on the basis of the identity of the speaker, be it a corporation, a labor union, or other association. *Id.* The political speech in that case was expenditures for electioneering communications. *Id.* at 337.

{¶96} The court further noted that it has upheld some speech restrictions that disadvantage certain persons based on an interest in allowing governmental entities to perform "certain governmental functions that cannot operate without some restrictions on particular kinds of speech." *Id.* at 341. However, one would be hard-pressed to identify a governmental function (or for that matter, a private business' operations) that would be disabled by union members engaging in informational picketing at either a board member's place of employment about the board member's action taken as a

31

board member, as opposed to informational picketing by a non-union advocacy group about the same subject at that same board member's place of employment.

{¶97} In *Sorrell*, addressing commercial speech, the court held that Vermont's statute restricting the sale, disclosure, and use of pharmacy records for marketing purposes imposed a specific, content and speaker-based restriction on free speech meriting heightened judicial scrutiny. *Id.* at 557.

{¶98} In regard to non-labor union picketing, the court has determined that picketing at a soldier's funeral with signs displaying negative, "hyperbolic rhetoric" about the Catholic Church, sexual orientation, 9/11, and dead soldiers was entitled to "special protection" under the First Amendment because it was speech at a public place on a matter of public concern, as opposed to matters of purely private significance, subject only to reasonable time, place, or manner restrictions. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

{¶99} As this court's opinion correctly notes, the prohibition in section 8(b)(4)(ii)(B) of the NLRA is expressly limited to "threats," "coercion," or "restraint," and the Supreme Court of the United States has cautioned that this language is "nonspecific, indeed vague," and should be interpreted with "caution" and not given a "broad sweep." *Natl. Labor Relations Bd. v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 290 (1960).

{¶100} Despite the court's limiting constructions, however, commentators have questioned the constitutionality of section 8(b)(4)(ii)(B) in light of the court's modern First Amendment jurisprudence. *See generally* Joseph L. Guza, Comment, *A Cure for Laryngitis: A First Amendment Challenge to the NLRA's Ban on Secondary Picketing*,

32

59 Buff.L.Rev. 1267 (Dec.2011); Zoran Tasic, Note, *The Speaker the Court Forgot: Re-evaluating NLRA Section 8(B)(4)(B)'s Secondary Boycott Restrictions in Light of Citizens United and Sorrell*, 90 Wash.U.L.Rev. 237 (2012).

**Ohio Protections**

{¶101} Finally, I believe the interests that R.C. 4117.11(B)(7) purportedly serves must also be considered in relation to the protections under Ohio law.

{¶102} As this court's opinion aptly notes, Section 11, Article I, of our state Constitution is much more detailed in its protections than the First Amendment to the Federal Constitution, stating, in relevant part, as follows:

{¶103} "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

{¶104} Notably, this section specifically protects the right to "publish." *Id*. "Publication" is defined as the "act or process of publishing; a published work." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/publication (accessed Dec. 17, 2020). "Publish" is defined as "to make generally known; to make public announcement of; to place before the public: disseminate." *Id*., https://www.merriam-webster.com/dictionary/publish (accessed Dec. 17, 2020). Picketing is one method of publication of one's sentiments.

{¶105} It is important to recognize that the word "publish" was not included in the state's original Constitution of 1802. *See* Ohio Constitution of 1802, Article VIII, Section 6. It was added in 1851, as a part of the overarching sentiment from the constitutional convention of 1850 to create a more democratic system of government. The new

Constitution also gave Ohio voters the right to elect the governor, other high-ranking state officials, and judges. *See* Ohio Constitution, Article III, Section 1, and Article IV, Section 6. The voters had to approve all constitutional amendments in the future and received the option to call a new constitutional convention every twenty years. *See* Ohio Constitution, Article XVI, Sections 1 and 3.

{¶106} As this court's opinion further notes, the Ohio Constitution also addresses the welfare and rights of employees. Specifically, Article II was added after the Ohio Constitutional Convention of 1912, which was called in large part as a result of the Progressive movement seeking social and political reform, especially in the areas of women's rights and organized labor. As this court has previously explained:

{¶107} "'Among those provisions [dealing with the welfare and rights of employees drafted and recommended for adoption at the Ohio Constitutional Convention of 1912] was Section 33, Article II, dealing with mechanics' liens; Section 35, Article II, authorizing a workers' compensation system; Section 37, Article II, providing for an eight-hour day for employees engaged in public works; and Section 41, Article II, setting forth restraints upon the exploitation of prison labor for competitive advantage.

{¶108} "'Probably the most comprehensive of the provisions was Section 34, Article II, which *manifested the broad purpose of proclaiming and securing to the General Assembly the power to enact legislation establishing employee rights and protections.*'" (Emphasis sic.) *Am. Fedn. of State, Cty. & Mun. Emps. Local # 74 v. Warren*, 177 Ohio App.3d 530, 2008-Ohio-3905, ¶47-48 (11th Dist.), quoting *Kettering v. State Emp. Relations Bd.*, 26 Ohio St.3d 50, 57 (1986) (Douglas, J., concurring).

{¶109} As recognized by the Seventh District in *Harrison Hills*, the NLRA does not apply to public employees. *Id.* at ¶32. Thus, various states, including Ohio, have enacted collective bargaining laws to govern labor relations disputes between public employees and public employers. *Id.*

{¶110} R.C. 4117.11(B) was enacted in 1984 as part of the Public Employees Collective Bargaining Act (the "Act"), which is codified in R.C. Chapter 4117. *See Kettering* at 50. According to the Supreme Court of Ohio, "[t]he Act was designed to 'minimize the possibility of public-sector labor disputes,' to bring 'stability and clarity to an area where there had been none,' and to 'facilitate the determination of the rights and obligations of government employees and employers, and give them more time to provide safety, education, sanitation, and other important services.'" *Id.* at 55, quoting *State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.*, 22 Ohio St.3d 1, 5 (1986). In addition, "the Act assures that both public employers and employees will be accorded many of the same rights and be governed by many of the same responsibilities as employees and employers in the non-public sector." *Dayton Fraternal Order* at 5.

{¶111} The court characterized the Act as the General Assembly's exercise of its "police power to promote the general safety and welfare." *Id.* And according to the General Assembly, the Act is to be liberally construed to promote "orderly and constructive relationships between all public employees and their employers." R.C. 4117.22.

{¶112} Accordingly, I would also conclude that SERB has failed to meet its burden under Ohio law to establish that R.C. 4117.11(B)(7) is necessary to serve a

35

compelling state interest and is narrowly tailored to achieve that interest by the least restrictive means.